UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

Arini Credit Master Fund Limited and Tresidor Europe Credit Limited,

Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding

Case No. ____________

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

PALLAS PARTNERS (US) LLP
75 Rockefeller Plaza
New York, New York 10019
(212) 970-2300

*Attorneys for Petitioners*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

A. Petitioners, the Notes, and the Aston Martin Group. ........ 4

B. The Transaction.. ........ 5

C. Pre-Action Correspondence. ........ 8

D. The Contemplated Foreign Proceeding.. ........ 12

E. The Requested Discovery. ........ 14

ARGUMENT ........ 15

POINT I: THE APPLICATION SATISFIES THE THREE STATUTORY REQUIREMENTS OF SECTION 1782 ........ 16

A. Respondents Are "Found In" This District. ........ 16

B. The Requested Discovery Is "For Use" in the Foreign Proceeding. ........ 17

1. The Requested Discovery Will Be Used to Some Advantage in the Foreign Proceeding. ........ 17

2. The English Proceeding Is in Reasonable Contemplation. ........ 19

C. Petitioners Are "Interested Persons." ........ 21

POINT II: THE *INTEL* FACTORS SUPPORT GRANTING DISCOVERY ........ 22

A. Respondents Will Not Be Participants in the Foreign Proceedings. ........ 22

B. English Courts Are Receptive to 1782 Discovery. ........ 23

C. The Application Does Not Circumvent Foreign Proof-Gathering Restrictions. ........ 24

D. The Subpoenas Are Not Unduly Burdensome.. ........ 25

CONCLUSION ........ 26

# TABLE OF AUTHORITIES

## Cases

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
785 F. Supp. 2d 434 (S.D.N.Y. 2011)........................................................................... 21

*Brandi–Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)........................................................................................ 17, 23

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995)............................................................................ 3, 23, 25, 26

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017)....................................................................................... 15, 18

*In re Al-Attabi*,
No. 21 Misc. 207, 2022 WL 229784 (S.D.N.Y. Jan. 26, 2022)............................................... 23

*In re Associacao dos Profissionais dos Correios*,
No. 22 Misc. 132, 2024 WL 4299019 (S.D.N.Y. Sept. 25, 2024)........................................... 19

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998)............................................................................................ 25

*In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*,
No. 23 Misc. 208, 2024 WL 555780 (S.D.N.Y. Jan. 18, 2024),
*report and recommendation adopted* (S.D.N.Y. Feb. 12, 2024) ............................................ 24

*In re Cheyne European Strategic Value Credit RAIF–Cheyne European Special Situations Fund,*
No. 25 Misc. 180 (S.D.N.Y. 2025),
*report and recommendation adopted* (S.D.N.Y. 2026) (Dkt. 56)...................................... 17, 19

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019)....................................................................................... 16, 25

*In re Fed. Republic of Nigeria*,
No. 21 Misc. 7, 2022 WL 4234556 (S.D.N.Y. Sept. 14, 2022)............................................... 24

*In re Kuwait Ports Auth.*,
No. 20 Misc. 46, 2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ............................................. 21

*In re Marinakis*,
No. 24 Misc. 485, 2025 WL 696769 (S.D.N.Y. Feb. 21, 2025),
*report and recommendation adopted* (S.D.N.Y. Mar. 4, 2025)......................................... 22, 24

*In re Mutabagani*,
No. 22 Misc. 299, 2023 WL 2811621 (S.D.N.Y. Apr. 6, 2023)............................................. 19

*In re Orthogen Int'l GmbH*,
No. 23 Misc. 152, 2025 WL 662699 (S.D.N.Y. Feb. 28, 2025) .......... 21

*In re Polygon Glob. Partners LLP*,
No. 21 Misc. 364, 2021 WL 2117397 (S.D.N.Y. May 25, 2021) .......... 22

*In re Porsche Automobil Holding SE*,
No. 15 Misc. 417 (LAK), 2016 WL 702327(S.D.N.Y. Feb. 18, 2016) .......... 16, 22, 23, 26

*In re Top Matrix Holdings Ltd.*,
No. 18 Misc. 465, 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .......... 19, 22

*In re Tovmasyan*,
557 F. Supp. 3d 348 (D.P.R. 2021) .......... 20

*In re Zouzar Bouka*,
637 F. Supp. 3d 74 (S.D.N.Y. 2022) .......... 19

*Inland Revenue Commissioners v Hashmi*,
[2002] EWCA Civ 981 .......... 13

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) .......... *passim*

*LEG Q LLC v. RSR Corp.*,
No. 3:17-cv-1559-N-BN, 2017 WL 3780213 (N.D. Tex. Aug. 31, 2017) .......... 20

*Marubeni Am. Corp. v. LBA Y.K.*,
335 F. App'x 95 (2d Cir. 2009) .......... 16

*Mees v. Buiter*,
793 F.3d 291(2d Cir. 2015) .......... 16, 17, 18, 24

*Sampedro v. Silver Point Cap., L.P.*,
818 F. App'x 14 (2d Cir. 2020) .......... 17

**Statutes**

28 U.S.C. § 1782 .......... *passim*

Section 423 of the Insolvency Act 1986 .......... *passim*

**Rules**

Civil Procedure Rule 31.16 .......... 12

Federal Rule of Civil Procedure 30(b)(6) .......... 26

Arini Credit Master Fund Limited and Tresidor Europe Credit Limited, ("Petitioners") respectfully submit this memorandum of law in support of their application for an order pursuant to 28 U.S.C. § 1782 (the "Application"): (a) granting Petitioners leave to serve subpoenas (the "Subpoenas") on HPS Investment Partners LLC ("HPS LLC"), Authentic Brands Group LLC ("Authentic Brands LLC"), Moelis & Company ("Moelis"), and Lazard Inc. ("Lazard") (collectively, "Respondents"); (b) directing each Respondent to produce the materials called for in the Subpoenas within thirty days of service; (c) directing each Respondent to provide deposition testimony in compliance with the Subpoenas on a mutually agreeable date within a reasonable time after each Respondent's final production of documents in response to the Subpoenas; and (d) granting any and all other relief the Court deems just and proper.

## PRELIMINARY STATEMENT

This Application seeks discovery under 28 U.S.C. § 1782 from Respondents, which are entities based in this District, for use in a forthcoming foreign proceeding in England (the "English Proceeding"). The English Proceeding will relate to an asset-stripping transaction involving Aston Martin, the luxury English automobile company. Petitioners own certain Notes (defined below) under an Indenture (defined below). Petitioners and other Noteholders intend to challenge a transaction between the group of companies headed by Aston Martin Lagonda Global Holdings plc (the "Company" and, together with its subsidiaries, the "Group") and new money lenders through which the brand's intellectual property—approximately 200 trademarks and approximately 500 designs owned by Aston Martin Lagonda Limited ("AMLL"), a Guarantor under the Indenture, including the Aston Martin's iconic brand—will be improperly transferred to new Aston Martin subsidiaries in order to (a) put them beyond the reach of Petitioners and other Noteholders and/or (b) prejudice the interests of the Noteholders (the "Transaction"). This

improper Transaction will provide outsized value and control to the new money lenders to the detriment of Petitioners and other Noteholders, and will ensure that the fundamental value of the Group cannot be realized through any insolvency.

Members of an ad hoc group of Noteholders (the "AHG"), of which Petitioners are a member, have expressed concern to the Group about its deteriorating financial condition for months and have offered to provide new financing to support the Group's financial health. But the Group has left Petitioners in the dark, including about the terms of the Transaction. In response to Petitioners' outreach, the Group has provided minimal details about the Transaction, refused to provide key documents, and has agreed only to provide Petitioners with a brief window of notice prior to enacting the Transaction's most harmful elements. Petitioners believe that the Transaction is unlawful under England's Section 423 of the Insolvency Act 1986 and thus seeks document and deposition discovery from Respondents—counterparties to and financial advisors for the Transaction—for use in Petitioners' forthcoming English Proceeding.

The Application satisfies the statutory requirements of Section 1782. Respondents are headquartered in New York, New York, and are thus "found" in this District. The requested discovery is "for use" in the English Proceeding, which is in reasonable contemplation, as demonstrated by the declaration provided by Fiona Huntriss, English counsel to the AHG (including Petitioners), which intends to file suit in England to challenge the Transaction. That declaration details the legal and factual bases for the Section 423 claim in the English Proceeding, as well as the parties that will be named. Counsel for the AHG (including Petitioners) have already sent pre-litigation correspondence to the prospective defendants, a necessary precursor to filing the English Proceeding. Finally, as a contemplated plaintiff in the English Proceeding, Petitioners are an "interested person" under the statute.

In addition, each of the Supreme Court's factors that guide this Court's exercise of discretion under Section 1782 weighs decisively in favor of granting the Application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004).

*First*, because Respondents will not be parties to the English Proceeding, the Application seeks discovery from "nonparticipants." *Id.*

*Second*, "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance" all support granting the Application. *Id.* There is no indication, let alone the required "authoritative proof," suggesting that English courts might be unreceptive to Section 1782 assistance. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995). To the contrary, U.S. courts, including courts in this District, have routinely granted Section 1782 applications for discovery in aid of proceedings in England. In the English Proceeding, an English court will consider all relevant evidence so long as it was lawfully obtained, including through Section 1782.

*Third*, the Application is not an improper attempt to circumvent any foreign discovery restrictions on proof gathering. *Intel*, 542 U.S. at 264–65. The requested discovery does not implicate any privilege or special protection that would make it improper under English law.

*Finally*, the requested discovery is not unduly intrusive or burdensome. *Id.* at 265. Respondents played a critical role in the Transaction, as counterparties to the Transaction or as financial advisors that provided valuation and other analysis to guide the Transaction. Documents and deposition testimony from Respondents are thus likely to be highly relevant to the English Proceeding.

Petitioners thus respectfully request that the Court grant the Application.

## BACKGROUND

### A. Petitioners, the Notes, and the Aston Martin Group.

Petitioners are members of the AHG, each of which is a holder of notes issued by Aston Martin Capital Holdings Limited under the Senior Secured Notes due in 2029 (the "Notes"). Declaration of Fiona Huntriss ("Huntriss Decl.") ¶¶ 2, 5, 7. The Notes, which are comprised of £565 million Senior Secured Notes and $1,050 million Senior Secured Notes, were issued pursuant to a Senior Secured Notes Indenture, dated March 21, 2024 (the "Indenture"). *Id.* ¶ 5. The Indenture is governed by New York law. *Id.* The Notes form part of the financing for the group of companies headed by the Company. *Id.*

The Notes are secured. Prior to the Transaction that will be at issue in the English Proceeding, the obligations under the Notes were secured by, among other things, fixed charge security over trademarks, designs and other intellectual property of the Group (including the 195 UK-registered trademarks, 474 UK-registered designs, 69 EU-registered trademarks, and 558 EU-registered designs) which were the subject of the Release of IP Security (defined below) and previously owned by AMLL, a Guarantor under the Indenture (the "Brand IP"). *Id.* ¶ 6. The Brand IP comprises the "Aston Martin" brand and the Group's associated non-automotive intellectual property. *Id.* The Group has repeatedly described the "Aston Martin" brand as among its most valuable strategic assets and as fundamental to sustaining long-term shareholder value. *Id.*

In the past year, the Group has experienced sustained and material deterioration in its financial position. *Id.* ¶ 8. Revenue and earnings before interest and taxes have declined significantly, gross debt has increased, and the Company's share price has fallen by over 56% over the past 12 months. *Id.* In recent months, the AHG, including Petitioners, has repeatedly expressed serious concerns to the Group about its financial health and about transactions the Group has

engaged in that the AHG considers to be value destructive. *Id.* ¶ 9. Unfortunately, the Group has not engaged meaningfully with these concerns or with any discussions initiated by the AHG regarding an alternative financing offer to help stabilize the Group's financial condition. *Id.*

**B. The Transaction.**

On July 22, 2026, the Company announced, by way of a London Stock Exchange regulatory news service notice (the "July 22 RNS"), £550 million in new debt financing and associated arrangements between the Group and new lenders, funds and accounts managed by HPS LLC and its affiliates (the "HPS Funds") and ABG Europe (UK) Limited ("ABG," and together with HPS Funds, the "New Money Lenders"). *Id.* ¶ 10. While not included in the July 22 RNS, Petitioners now understand that, as part of the Transaction, (a) 50.1% of what the Company describes as non-automotive intellectual property will be transferred to ABG, and (b) the Brand IP (or the remaining Brand IP, or a portion of the remaining Brand IP), shares in the company that owns the Brand IP, and/or the value derived from the Brand IP are in the process of being transferred outside the Restricted Group and beyond the reach of the Noteholders. *Id.* A further RNS was published on July 27, 2026 (together with the July 22 RNS, the "RNSs"), but it contained very limited details. *Id.*

The AHG have learned of certain details of the Transaction from the board minutes of Aston Martin Investments Limited ("AMIL"), dated July 20, 2026; an English law deed of release, dated July 22, 2026 (the "Release of IP Security"); information made available through the RNSs; information filed at Companies House, a British executive agency; related security documentation provided by the trustee and security agent for the Notes; and information available at the UK Intellectual Property Office and EU Intellectual Property Office. Based on those materials, Petitioners believe the Transaction was completed via the following steps:

- The Group incorporated five new subsidiaries in the Cayman Islands for the purposes of the Transaction: Silver New HoldCo, Silver HoldCo 1, Silver HoldCo 2, SilverCo, and SilverCo 2. Group directors were appointed as directors of those subsidiaries. Upon incorporation, each of these entities was a "Restricted Subsidiary" subject to the restrictive covenants in the Indenture (together, the "Restricted Group"). Another company, Silver HoldCo B Limited, was incorporated in England and Wales.

- SilverCo 2 was designated an "Unrestricted Subsidiary" under the Indenture on or about July 21, 2026 such that it sits outside the Restricted Group.

- Silver HoldCo 2 entered into a term loan facilities agreement (the "Term Loan Facilities Agreement") with funds owned and/or managed by New Money Lenders (the HPS Funds and ABG) comprising: (i) a £450 million senior secured term loan (the "SSTL"), and (ii) a £100 million delayed draw term loan (the "DDTL," and together with the SSTL, the "New Money"). The DDTL is committed by the HPS Funds and is accessible only if 50.1% of certain Brand IP is transferred from AMLL to ABG in exchange for the DDTL.

- Intra-Group loans or advances (each in the amount of £158,479,999) (funded by drawings under the SSTL) were made from Silver HoldCo 2 to SilverCo 2, and then from SilverCo 2 to AMLL, which AMLL then applied towards the prepayment and cancellation in full of the Group's existing senior secured revolving credit facility.

- The fixed charge security held by the security agent (on trust for the Noteholders and other secured creditors) over the Brand IP was purportedly released on July 22, 2026, pursuant to the Release of IP Security. The released Brand IP included 195 UK-registered trademarks, 474 UK-registered designs, 69 EU-registered trademarks, and 558 EU-registered designs owned by AMLL (a Guarantor under the Indenture).

- Concurrently with the Release of IP Security, the Brand IP was transferred by AMLL to SilverCo, a Restricted Subsidiary within the Restricted Group, without that entity acceding to the Indenture as an additional Guarantor or granting replacement security over the Brand IP to the security agent for the Noteholders.

- New security was granted to the New Money Lenders over certain current and future assets of the Restricted Group (including those of SilverCo).

- As a contemplated further step, Petitioners believe that ABG will acquire 50.1% of AMLL's "non-automotive related intellectual property" from SilverCo "in exchange for the DDTL" (the "50.1% Disposal"), such that the DDTL will only become accessible to the Group upon completion of the 50.1% Disposal.

Petitioners and the AHG believe that the Transaction has caused, or is intended to cause, the Group's most valuable assets—the Aston Martin iconic brand—to be moved outside the security package relied on by the Noteholders, and, ultimately, to be placed under the control of the New Money Lenders for consideration that is materially lower than the assets' fair market value. *Id.* ¶ 12. Additional features of the Transaction also suggest that the precise terms on which the Brand IP has moved from AMLL, and the proposed arrangement with ABG (particularly the actual or contemplated license-back arrangements in relation to any of the foregoing) will provide outsized value and control to the New Money Lenders to the detriment of Noteholders. *Id.* ¶ 13. For example, the AHG believes that the license arrangements may contain termination events, including rights to terminate on the insolvency of the Group and/or a change of control that would operate as a "poison pill" if the Group becomes unable to repay its debts at maturity and it is necessary to restructure the Group's debt. *Id.* Such terms would prevent a change of ownership or control of the Group through a restructuring or otherwise and would ensure that the fundamental value of the Group cannot be realized through any insolvency, restructuring, or enforcement.

On August 5, 2026, information became available at Companies House indicating that the Group's core intellectual property rights are now held by Cayman-incorporated Restricted Subsidiaries, that equitable mortgages over shares in those subsidiaries were executed on July 22, 2026 as conditions of the Term Loan Facilities Agreement (the "Equitable Mortgages"), and that a holding structure and the issuance of certain "Class B Shares" to Silver HoldCo B Limited, an English company that sits at the top of Cayman-incorporated holding companies and outside the Restricted Group, may operate to divert valuable rights away from the Restricted Group in a manner prejudicial to the Noteholders. *Id.* ¶ 14.

A further floating charge dated July 22, 2026, granted by Silver HoldCo B Limited (the same entity that is outside of the Restricted Group) in favor of GLAS Trust Corporation Limited as security agent, has since appeared at Companies House. *Id.* ¶ 15. That charge does two things. First, through a holding-company covenant, it records that Silver HoldCo B Limited owns (or may in the future own) shares in each of the Cayman holding companies, Silver New HoldCo, Silver HoldCo 1, Silver HoldCo 2, and SilverCo. Second, it grants security over Silver HoldCo B Limited's entire undertaking, including any intellectual property it may hold, and sets out detailed provisions requiring that intellectual property to be registered. *Id.* Petitioners believe that this structure is intended to enable the Brand IP (or a portion thereof), and the value derived from it, to be held outside the Restricted Group and beyond the reach of the Noteholders.[1] *Id.*

**C. Pre-Action Correspondence.**

In the weeks before the Transaction, the AHG (including Petitioners) wrote to the Company and its advisers on July 8, 15, and 16, 2026. *Id.* ¶ 16. On July 19, 2026, Quinn Emanuel Urquhart & Sullivan LLP wrote to the Company on behalf of certain Noteholders, expressing concerns about the Group's deteriorating financial condition and warning that the Transaction might place assets beyond the reach of creditors. *Id.* The AHG also offered to provide alternative financing on terms more favorable to the Group than those available under the Transaction. *Id.* The Group did not meaningfully respond to that correspondence. *Id.*

The Group responded only after the July 22 RNS—and only on brief terms—claiming that it had complied with its obligations to the Noteholders. Notably, the Group declined to provide substantive details as to the nature, scope, or terms of the Transaction, including which

[1] Petitioners continue to monitor the position, as no intellectual property has yet been recorded as held by Silver HoldCo B Limited from information available at the U.K. Intellectual Property Office and EU Intellectual Property Office.

assets supported the New Money financing and how the New Money financing affected Noteholders' rights. *Id.* ¶ 17.

On August 2, 2026, Pallas Partners LLP ("Pallas"), English litigation counsel to the AHG (including Petitioners), sent a letter before claim to the Company and AMIL, in accordance with the Practice Direction on Pre-Action Conduct and Protocols under the Civil Procedure Rules of England and Wales (the "Letter Before Claim"). *Id.* ¶ 18. The Letter Before Claim sets out the AHG's contention that the Transaction constitutes, among other things, a transaction defrauding creditors under Section 423 of the Insolvency Act 1986, a claim that Petitioners and other members of the AHG intend to pursue in the English Proceeding.

On August 4, 2026, Pallas wrote to ABG, enclosing the Letter Before Claim and putting ABG on notice that the Section 423 claim will seek an order (a) requiring the unwinding or setting aside of the 50.1% Disposal, and (b) requiring ABG to return the relevant Brand IP and take appropriate steps to restore its pre-Transaction position. *Id.* ¶ 19. In other words, ABG was advised not to take any action that would limit its ability to return the relevant Brand IP or restore the AHG to its prior position. ABG has not responded to this letter. *Id.*

On August 4, 2026, Latham & Watkins LLP ("Latham"), acting for the Company and AMIL, stated that the Company did not intend to implement the transfer of any interest in Brand IP to ABG in what it termed "short order," asserted that the Transaction "complies fully with the terms of the Notes," and said that the Company anticipated providing a substantive response to the Letter Before Claim by August 14, 2026. *Id.* ¶ 20.

On August 6, 2026, Pallas wrote to Latham raising further concerns arising from the Companies House information referred to above and making additional document and information requests. *Id.* ¶ 21. In particular, Pallas requested: (a) a full explanation of the

structuring and purpose of the Class B Shares and the Equitable Mortgages; (b) the incorporation documents of and any shareholder agreements in relation to SilverCo, Silver HoldCo 1, and Silver HoldCo 2; (c) all security documents executed or to be executed by those entities; (d) all agreements relating to the ownership and use of the Class B Shares; (e) the incorporation documents for Silver HoldCo 2 and SilverCo; (f) all board minutes and resolutions discussing the Equitable Mortgages and the issuance of the Class B Shares; (g) confirmation of whether the Class B Shares had been issued; (h) confirmation of whether any Brand IP had been or was intended to be transferred to any part of the new structure into which the Term Loan Facilities Agreement was being lent; and (i) an undertaking that the Class B Shares would not be issued without first providing 14 days' notice to the AHG, or alternatively details of the consideration received by the Restricted Group for those shares and any associated valuation. *Id.*

On August 7, 2026, Latham represented that the Company would not "transfer the Brand IP in the 14 days or any other period that can currently be specified" but did not provide any undertaking to that effect. *Id.* ¶ 22.

On August 14, 2026, the Company, through Latham, provided a purported substantive response to the Letter Before Claim (the "LBC Response"). *Id.* ¶ 24. The LBC Response denied the AHG's claims and did not engage with the issues raised in the Letter Before Claim. The Company asserted that: (a) the Transaction is a permitted secured financing; (b) no Brand IP has left the Restricted Group; (c) the Transaction is fully compliant with the Indenture; (d) no undervalue has occurred and the Transaction was not entered into for a prohibited purpose within the meaning of Section 423; and (e) no transaction with ABG in respect of non-automotive intellectual property has occurred or is contemplated "in the short term." *Id.* The Company declined to provide most of the documents sought and enclosed only a limited list of publicly filed

materials, largely already in Petitioners' possession. *Id.* None of the substantive transaction documents, valuation materials, board papers, license agreements, or facility agreements were provided. *Id.*

The LBC Response, of course, did not resolve the AHG's concerns. In particular, the Company avoided engaging with the AHG's specific concerns regarding the 50.1% Disposal, the poison pill terms relating to the 50.1% Disposal, or other aspects of the Transaction; provided no timeframe for the 50.1% Disposal; and failed to explain the role or security arrangements of Silver HoldCo B Limited (an entity outside the Restricted Group). *Id.* ¶ 25. The Company also declined to provide the majority of the documents that had been requested and provided only documents already in the AHG's possession or available via public sources. *Id.*

On August 15, 2026, Pallas wrote to Latham identifying certain deficiencies in the LBC Response and requesting, by August 17, 2026, a defined subset of key documents that would readily be identifiable by the Company (the "PAD Documents"), and an undertaking that the 50.1% Disposal would not be implemented until at least seven days after those documents were provided. *Id.* ¶ 26.

On August 17, 2026, the Company, through Latham, responded to Pallas's August 15, 2026 letter. *Id.* ¶ 27. In the letter, the Company undertook to give 14 days' written notice if it was to implement the 50.1% Disposal within 90 days but provided no further detail or comfort. The scope of the undertaking was also narrower than that requested and specified by Pallas in its letter of August 15 to Latham as it did not cover all potentially prejudicial actions with the intellectual property. *Id.* The Company also declined to provide the documents requested by the letter of August 15, 2026. *Id.*

On August 20, 2026, Pallas responded to Latham's August 17, 2026 letter (a) acknowledging the Company's undertaking but noted that it was too narrow, as it addressed only the 50.1% Disposal and did not cover other steps that could impair the intellectual property or control of intellectual property held by the Restricted Group (including transfers of shares in the new Cayman Islands-incorporated subsidiaries to entities outside the Restricted Group and the arrangements involving Silver Holdco B Limited); (b) requesting, by 23 August 2026, a revised undertaking extending to any transfer of intellectual property or shares in Group companies to entities outside the Restricted Group, and to any steps that would impair control or the right to use intellectual property of the Restricted Group (the "Revised Undertaking"); (c) reiterating the request for the certain narrow categories of documents, the PAD Documents, which Pallas asked to be provided by August 27, 2026 (and a draft confidentiality agreement, if the Group required one); and (d) stating that if the Company did not properly engage, one or more members of the AHG would seek a court order compelling provision of the PAD Documents by way of an expedited pre-action disclosure application under CPR 31.16.

While Latham sent a short holding response on August 21, 2026, that correspondence did not provide any of the previously requested documents or information, including the Revised Undertaking, the PAD Documents, or a draft confidentiality agreement. As of the date of this declaration, those materials remain outstanding, together with other material categories of documents.

**D. The Contemplated Foreign Proceeding.**

As a result, the Petitioners and other members of the AHG intend to file a claim under Section 423 of the Insolvency Act 1986 (the "Section 423 Claim") in the English Proceeding. *Id.* ¶ 30. The Section 423 Claim is directed at the poison pill terms of the Transaction, including

the 50.1% Disposal. The proposed defendants to the Section 423 Claim are the Company AMIL, AMLL, and ABG (together, the "English Defendants"). *Id.*

Section 423 of the Insolvency Act 1986 empowers English courts to make orders in respect of transactions entered into at an undervalue for a prohibited purpose. *Id.* ¶ 30. Where the requisite elements are established, the court has broad discretion to set aside or unwind the transaction (or particular steps within it), require the re-vesting or restoration of property, and release or discharge security granted as part of the transaction. *Id.*

Petitioners and other members of the AHG will advance the Section 423 Claim on the basis that the aspects of the Transaction including the 50.1% Disposal constitute an undervalue transaction entered into for the purpose of putting assets beyond the reach of Noteholders or otherwise prejudicing their interests. *Id.* ¶ 30. The Section 423 Claim will allege three elements:

- *Undervalue*: The Group will receive and/or has received significantly less than the value of the relevant Brand IP in consideration.

- *Prohibited purpose*: The purpose of the Transaction is to (i) put valuable assets beyond the reach of Noteholders and/or (ii) prejudice the interests of the Noteholders. It is well established that the prohibited purpose need not be the sole or dominant purpose of the transaction, but it must be a real and substantial purpose.[2]

- *Standing*: As beneficial holders of Notes for which a substantial portion of the security package has been disposed, Petitioners and other members of the AHG have standing under Section 423 because they are victims as their rights have been prejudiced by the Transaction.

*Id.* ¶ 31.

To date, Petitioners and other members of the AHG have taken the pre-action steps required by the Practice Direction on Pre-Action Conduct and Protocols to initiate proceedings against Defendants in England and Wales, including the service of the Letter Before Claim on

[2] *See Inland Revenue Commissioners v Hashmi* [2002] EWCA Civ 981.

August 2, 2026. *Id.* ¶ 30. While they continue to engage in correspondence, they have exhausted the requirements of the Pre-Action Protocol and are entitled to pursue proceedings in England and Wales against the English Defendants as soon as possible. *Id.* As explained above, Petitioners and other members of the AHG believe that they have an actionable claim under Section 423 with respect to the Transaction. *Id.* Without any waiver of privilege, they have engaged barristers and have instructed Pallas with respect to the preparation of the English Proceeding, such that those proceedings are within reasonable contemplation. *Id.*

**E. The Requested Discovery.**

The discovery sought through this Application (the "Requested Discovery") is directly relevant to, and is intended for use in, the contemplated Section 423 Claim in the English Proceeding. In particular, the requested discovery goes to the two central factual issues in that claim: undervalue and improper purpose.

As to undervalue, Petitioners seek, among other things: the transaction documents for the license-back of Brand IP (including with respect to the 50.1% Disposal); valuation reports and financial models concerning the Brand IP and the Group's wider intellectual property; materials evidencing any market-testing or marketing process for the Brand IP; documents concerning any strategy, plan, or intention to capture, realize, or retain the discount or value differential arising from the acquisition, transfer, or licensing of the Brand IP, including any strategy to obtain the Brand IP (or any interest therein) at a discount to its fair market value; and documents recording the consideration provided, or to be provided, including by ABG for the 50.1% interest in the relevant Brand IP.

As to improper purpose, Petitioners seek, among other things: Respondents' internal communications and analyses concerning the structuring of the Transaction (including the use of the Restricted Group, the position of Silver HoldCo B Limited outside the Restricted Group,

and the release of the Noteholders' security), the terms of the contemplated license-back (including the poison pill terms), the timing and confidentiality of the Transaction, and any assessment of the impact of the Transaction on the Noteholders or of the associated litigation risk. Such documents are relevant to understanding whether a real and substantial purpose of the Transaction was to put the Brand IP (or any portion thereof) beyond the reach of the Noteholders or otherwise to prejudice their interests.

These documents are likely to be held by HPS LLC and Authentic Brands LLC due to their relationship to the New Money Lenders, which advanced the New Money financing, including the DDTL (which is conditioned upon the 50.1% Disposal), and by Moelis and Lazard, who acted as financial advisers in connection with the Transaction and/or the Group's financing and are likely to hold valuation and process materials bearing on the value of the Brand IP.

## ARGUMENT

Section 1782 of Title 28 of the United States Code permits U.S. District Courts to grant discovery for use in a foreign proceeding. *Intel*, 542 U.S. at 246. A Section 1782 application must satisfy three statutory requirements: (a) the discovery is sought from someone who resides or is found within the district; (b) the discovery is for use in a foreign proceeding before a foreign tribunal; and (c) the applicant is an "interested person." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017).

If these statutory requirements are met, the court then considers four discretionary so-called *Intel* factors in deciding whether to grant a Section 1782 application: (a) whether the person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (b) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial

assistance"; (c) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (d) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65.

In exercising this discretion, courts are mindful of "the twin aims of [Section 1782]: providing efficient means of assistance to participants in international litigation in federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mees v. Buiter*, 793 F.3d 291, 297-98 (2d Cir. 2015). None of the discretionary factors should be given more weight than the others, and no one factor is dispositive. *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 97 (2d Cir. 2009). Moreover, "[a]s a general matter, the Supreme Court and the Second Circuit have made clear that district courts are to take a hospitable view of applications to compel the production of evidence by persons found or residing in the United States for use in foreign litigation." *In re Porsche Automobil Holding SE*, No. 15 Misc. 417 (LAK), 2016 WL 702327, at *2 (S.D.N.Y. Feb. 18, 2016).

## POINT I

## THE APPLICATION SATISFIES THE THREE STATUTORY REQUIREMENTS OF SECTION 1782

### A. Respondents Are "Found In" This District.

Section 1782's first statutory element—that an entity "resides or is found" in the District—is coextensive with the limits of personal jurisdiction consistent with due process. *In re del Valle Ruiz*, 939 F.3d 520, 527–28 (2d Cir. 2019). Here, each Respondent is headquartered in New York, New York. HPS LLC's headquarters is located at 40 West 57th Street, New York, New York 10019. Authentic Brands LLC's headquarters is located at 1411 Broadway, New York, New York 10018. Moelis's headquarters is located at 399 Park Avenue, New York, New York 10022. Lazard's headquarters is located at 30 Rockefeller Plaza, New York, New York 10112.

Declaration of Joshua A. Naftalis ("Naftalis Decl."), Exs. E-H. Thus, each Respondent is at home in this District. *See, e.g.*, *In re Cheyne European Strategic Value Credit RAIF–Cheyne European Special Situations Fund*, No. 25 Misc. 180 (AT) (SN), at 5 (S.D.N.Y. Oct. 15, 2025) (Dkt. 31), *report and recommendation adopted*, No. 25 Misc. 180 (AT) (SN) (S.D.N.Y. June 30, 2026) (Dkt. 56). Accordingly, Section 1782's first statutory element is satisfied.

### B. The Requested Discovery Is "For Use" in the Foreign Proceeding.

The second statutory element requires that the requested discovery be "for use" in a foreign proceeding. A Section 1782 petitioner satisfies this requirement "by showing that the materials she seeks are to be used at some stage of a foreign proceeding that was within reasonable contemplation at the time of the [application]." *Mees*, 793 F.3d at 301. The "for use" requirement thus includes two prongs: first, that the requested discovery can be used at some stage in the proceedings, and second, that the foreign proceeding is pending or in "reasonable contemplation." Both prongs are satisfied here.

#### 1. The Requested Discovery Will Be Used to Some Advantage in the Foreign Proceeding.

The first prong of the "for use" requirement is a modest one, requiring only that the requested discovery "will be *employed with some advantage* or *serve some use* in the [foreign] proceeding—not necessarily [that it is] something without which the applicant could not prevail." *Id.* at 298 (emphasis added). Discovery need not be admissible to be "for use" in a litigation, "[r]egardless of whether a foreign tribunal may deny admission of a document in the future, or whether it already has." *Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14, 17 (2d Cir. 2020) (amended June 5, 2020). Indeed, a Section 1782 petitioner is not required to demonstrate that the information sought would be discoverable or admissible in the foreign proceeding. *Brandi–Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012). Instead, the district court

considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight*, 869 F.3d at 131 (emphasis in original); *see also Mees*, 793 F.3d at 298 ("for use" element satisfied if materials sought can "be employed with some advantage or serve some use in the proceeding").

Here, the Requested Discovery is intended for use in the English Proceeding, which concerns the 50.1% Disposal. The HPS Funds and ABG (the New Money Lenders) act as the counterparties to the New Money financing and the 50.1% Disposal. HPS LLC, as the manager (or parent company or affiliate of the manager) of the HPS Funds and Authentic Brands LLC, as a parent company or affiliate of ABG, are likely to have documents, including internal communications and analyses concerning the structuring of the Transaction (including the use of the Restricted Group, the position of Silver HoldCo B Limited outside the Restricted Group, and its grant of security over its entire undertaking (including intellectual property) for the New Money Lenders, and the release of the Noteholders' security), the terms of the contemplated license-back (including the poison pill terms), the timing and confidentiality of the Transaction, and any assessment of the impact of the Transaction on the Noteholders or of the associated litigation risk, which will be helpful to Petitioners in showing that the purpose of the Transaction, including the 50.1% Disposal, was to put certain valuable IP security beyond the reach of Noteholders or to otherwise prejudice their interests. Moelis and Lazard, who acted as financial advisers in connection with the Transaction and/or the Group's financing, are likely to hold valuation and process materials bearing on the value of the Brand IP and it was conducted at fair market value for the Brand IP.

Pallas, the AHG's English counsel, has confirmed that the Requested Discovery is likely to be relevant to the English Proceeding and that English courts will consider any relevant

evidence so long as it is lawfully obtained, including through Section 1782. *See* Huntriss Decl. ¶¶ 35, 36, 41-46.

**2. The English Proceeding Is in Reasonable Contemplation.**

The second prong of the "for use" requirement is satisfied where the foreign proceeding is in "reasonable contemplation," but the proceeding need not be "pending" or "imminent" in order to meet the "for use" requirement. *Intel*, 542 U.S. at 258–59. Courts in this Circuit have held that the "for use" requirement imposes a *de minimis* burden on petitioners. *See, e.g., In re Associacao dos Profissionais dos Correios*, No. 22 Misc. 132 (RA), 2024 WL 4299019, at *4 (S.D.N.Y. Sept. 25, 2024) (collecting cases); *In re Cheyne European Strategic Value Credit RAIF* (Dkt. 56), at 6. "The Second Circuit has interpreted reasonable contemplation to require some objective indicium or some concrete basis of petitioners' intent to initiate a foreign proceeding." *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *4 (S.D.N.Y. Jan. 16, 2020) (cleaned up). "This Circuit has found that sworn statements attesting to petitioners' intent to litigate and describing the legal theories on which they plan to rely are sufficiently concrete to meet the statutory requirement." *Id.* The English Proceeding more than meets the standard for a foreign proceeding in reasonable contemplation.

*First*, Petitioners have engaged English counsel and submitted a sworn declaration from such counsel detailing the legal and factual basis for its Section 423 Claim in the English Proceeding. *See generally* Huntriss Decl.; *see also In re Zouzar Bouka*, 637 F. Supp. 3d 74, 85–87 (S.D.N.Y. 2022) (finding "for use" standard met where petitioner "has engaged local counsel and have instructed him to prepare pleadings," "identified the conduct that gives rise to the contemplated claims," and "detailed their theory for French courts' jurisdiction over their claims."); *In re Mutabagani*, No. 22 Misc. 299 (VB), 2023 WL 2811621, at *3 (S.D.N.Y. Apr. 6, 2023) (finding "for use" standard met where petitioner submitted sworn statement of foreign

lawyer that detailed his "intent to litigate 'as soon as possible,' describe[d] the legal theory on which [petitioner] plan[ned] to rely, and explain[ed] how [petitioner] intend[ed] to use the requested discovery in the anticipated proceeding") (citation omitted).

*Second*, Petitioners have initiated steps that are precursors to filing suit in England. The AHG's English counsel sent the Letter Before Claim, a procedural precursor to filing suit in which the AHG detailed its legal claims and the factual basis for those claims. Huntriss Decl. ¶ 18. Courts have routinely found that sending pre-action correspondence constitutes objective indication of a petitioner's intent to sue, satisfying the reasonable contemplation requirement. In *In re Tovmasyan*, 557 F. Supp. 3d 348, 355 (D.P.R. 2021), for example, the court held that a petitioner satisfied the reasonable contemplation requirement where it "served a letter of claim upon Equiti UK . . . which detailed the factual and legal bases supporting their claims against Equiti UK pursuant to the laws of England and Wales for damages." Similarly, in *LEG Q LLC v. RSR Corp.*, No. 3:17-cv-1559-N-BN, 2017 WL 3780213, at *6 (N.D. Tex. Aug. 31, 2017) (internal quotation marks omitted), the court held that the petitioner had shown English proceedings were in reasonable contemplation, where, as here, the petitioner "served a Letter Before Action on the intended defendants in the English Derivative Action and is in the midst of the pre-action correspondence process that typically precedes the filing of a shareholder derivative action in the English High Court."[3]

---

[3] *See also, e.g.*, *In re China Constr. Bank (Asia) Corp. Ltd.*, No. 23 Misc. 17 (JMF), 2023 WL 3791711, at *2 (S.D.N.Y. June 2, 2023) ("Among other things, [the petitioner] identified concrete steps it had taken to initiate the proceeding: It applied for certified copies of the Hong Kong judgment and certifications stating that the judgment was final, both of which are necessary to commence the proceeding."); *In re Miya Water Projects Netherlands B.V.*, No. 23-mc-00391 (GMM), 2023 WL 7283783, at *5 (D.P.R. Nov. 3, 2023) ("In her declaration, Counsel Roessingh provided a thorough statement describing the claims Miya anticipates pursuing in the District Court of Amsterdam, along with the facts and grounds upon which it may do so. Because Miya's Applications stated the theory of liability, along with the facts and grounds upon which it relies,

*Third,* Petitioners have retained English counsel for the purpose of filing suit, and such counsel has begun preparing the necessary filings for initiating the English Proceeding. *See generally* Huntriss Decl; *see, e.g.*, *In re Orthogen Int'l GmbH*, No. 23 Misc. 152 (VSB), 2025 WL 662699, at *3 (S.D.N.Y. Feb. 28, 2025) ("At the time of the Application, the Applicant demonstrated that the Contemplated German Proceeding was within reasonable contemplation, and it had retained German counsel and begun drafting the necessary pleadings.") (internal quotations marks omitted); *In re Kuwait Ports Auth.*, No. 20 Misc. 46 (ALC), 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021) (finding reasonable contemplation where petitioner "retained local Cayman counsel that has reviewed the relevant documents and begun preparing the necessary pleadings").

By retaining foreign counsel, sending required pre-action correspondence to the English Defendants, submitting a declaration detailing the factual and legal basis for the Section 423 Claim, identifying the English Defendants, and beginning to prepare the documents to initiate suit, Petitioners have satisfied the "reasonable contemplation" requirement.

### C. Petitioners Are "Interested Persons."

Petitioners are members of the AHG, the group of beneficial owners of the Notes that will act as the plaintiffs in the English Proceeding. Huntriss Decl. ¶ 2. "No doubt litigants are included among . . . the interested persons who may invoke § 1782." *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (quoting *Intel*, 542 U.S. at 256). Accordingly, this requirement is satisfied.

---

the Court finds that Miya properly pled that the proceeding before a foreign tribunal is 'within reasonable contemplation.'").

## POINT II

## THE *INTEL* FACTORS SUPPORT GRANTING DISCOVERY

### A. Respondents Will Not Be Participants in the Foreign Proceedings.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding because "when the person from whom discovery is sought is a participant in the foreign proceeding, the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Here, none of the Respondents will be a party to the English Proceeding and therefore will not be subject to party discovery in that proceeding. Huntriss Decl. ¶ 30.

Even where some of the Requested Discovery may be available from a party to the foreign proceeding, courts in this Circuit routinely grant Section 1782 discovery. *See, e.g.*, *In re Polygon Glob. Partners LLP*, No. 21 Misc. 364 (ER), 2021 WL 2117397, at *8 (S.D.N.Y. May 25, 2021) (ordering Section 1782 discovery where "some of the information sought is available directly through" party discovery in the foreign proceeding); *In re Top Matrix Holdings*, 2020 WL 248716, at *5 (ordering Section 1782 discovery where evidence was likely in possession of parent company subject to jurisdiction of foreign court); *In re Porsche*, 2016 WL 702327, at *8 (ordering Section 1782 discovery where petitioner "may be able to obtain from the German Plaintiffs documents" but there was "no indication that the disclosures would be sufficiently broad to give [petitioner] all that it seeks in this Section 1782 proceeding").

Because none of the Respondents will be a party to the English Proceeding, this factor weighs in favor of discovery. *See, e.g.*, *In re Marinakis*, No. 24 Misc. 485 (JGK) (HJR), 2025 WL 696769, at *5 (S.D.N.Y. Feb. 21, 2025), *report and recommendation adopted*, 2025 WL 693147 (S.D.N.Y. Mar. 4, 2025) ("Respondents are not parties, and are not expected to become parties, to the English Action. This weighs in favor of granting the application.").

### B. English Courts Are Receptive to 1782 Discovery.

The second *Intel* factor requires courts to consider whether the "nature, attitude and procedures" of the foreign tribunal indicate that it is receptive to Section 1782 assistance. *Brandi–Dohrn*, 673 F.3d at 81. In the Second Circuit, courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782 . . . as embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Euromepa*, 51 F.3d at 1100. "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Id.* at 1102; *see also In re Porsche*, 2016 WL 702327, at *8 ("The law on this factor is clear: 'District courts have been instructed to tread lightly and heed only clear statements by foreign tribunals' that they would reject Section 1782 assistance."). Therefore, there is a strong presumption that foreign tribunals will be receptive to evidence obtained under Section 1782, and the burden on the party opposing discovery to show that a foreign tribunal would reject the evidence obtained through Section 1782. *See, e.g.*, *In re Al-Attabi*, No. 21 Misc. 207 (VSB) (RWL), 2022 WL 229784, at *8 (S.D.N.Y. Jan. 26, 2022) ("Second Circuit case law places the burden on the party opposing discovery [under Section 1782] to show that a foreign court would *not* be receptive to this assistance.") (emphasis in original) (cleaned up).

English courts will consider evidence relevant to the Section 423 Claim, which centers on the propriety of the Transaction, including the 50.1% Disposal. As detailed in the declaration of Petitioners' English counsel, English courts commonly accept and consider evidence obtained through Section 1782. Huntriss Decl. ¶¶ 41–46. English courts have also expressly held that it is appropriate and permitted for parties to seek evidence through Section 1782. *Id.*

Multiple federal courts, including in this District, have similarly recognized that English courts are receptive to evidence obtained through Section 1782. *See, e.g.*, *In re Marinakis*, 2025 WL 696769, at *5 ("[T]here is no apparent reason to believe that the court presiding over the English Action would be unreceptive to this discovery. Other decisions in this District have reached the same conclusion in connection with Section 1782 applications seeking discovery for use in English courts.") (internal citation omitted); *In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*, No. 23 Misc. 208 (JGLC) (GS), 2024 WL 555780, at *11 (S.D.N.Y. Jan. 18, 2024), *report and recommendation adopted*, 2024 WL 554302 (S.D.N.Y. Feb. 12, 2024) ("Courts in this District applying the second *Intel* factor routinely find that courts in the United Kingdom are receptive to Section 1782 discovery.") (cleaned up); *In re Fed. Republic of Nigeria*, No. 21 Misc. 7 (JGK) (VF), 2022 WL 4234556, at *5 (S.D.N.Y. Sept. 14, 2022) ("Respondent has not provided any authoritative proof that the English courts would reject the evidence obtained by Nigeria's 1782 application."). Accordingly, the second *Intel* factor weighs in favor of discovery.

**C. The Application Does Not Circumvent Foreign Proof-Gathering Restrictions.**

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. In *Intel*, the Supreme Court expressly rejected the contention that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself. *Id.* at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). This factor thus weighs against discovery only in the extreme circumstances where a Section 1782 application would circumvent "[p]roof-gathering restrictions," that is, "rules akin to privileges that *prohibit* the acquisition or use of certain materials," *Mees*, 793 F.3d at 303 n.20 (emphasis in original), or "discovery that trenched upon

the *clearly established* procedures of a foreign tribunal," *Euromepa*, 51 F.3d at 1099 (emphasis in original). No such circumstance is present here, as English courts expressly permit parties to obtain evidence through any lawful channel, including through Section 1782. Huntriss Decl. ¶¶ 41–46.

**D. The Subpoenas Are Not Unduly Burdensome.**

The fourth *Intel* factor is satisfied because the Requested Discovery is not "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in civil litigation under the Federal Rules of Civil Procedure. *See In re del Valle Ruiz*, 939 F.3d at 532–33 ("[T]he text of § 1782 authorizes discovery pursuant to the Federal Rules of Civil Procedure"); *see also In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998) ("The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute.").

*First*, Petitioners only seek evidence that is relevant to its Section 423 Claim in the English Proceeding, namely, evidence related to the Transaction, including the 50.1% Disposal. These documents are likely to be held by HPS LLC and Authentic Brands LLC because of their relationship to the New Money Lenders, which are counterparties to the Transaction, and by Moelis and Lazard, who acted as financial advisors in connection with the Transaction and/or the Group's financing and are likely to hold valuation and process materials bearing on the value of the Brand IP. Given Respondents' participation in structuring the Transaction and determining the fair market value of the Brand IP, Respondents' documents and deposition testimony are highly relevant to the English Proceeding.

*Second*, the time period of the Requested Discovery is limited to the period in which the Transaction was being contemplated, negotiated, and executed.

*Third*, deposition testimony is not unduly burdensome here, particularly given HPS LLC's and Authentic Brands LLC's relationship to the New Money Lenders, which are counterparties to the Transaction, and Moelis's and Lazard's role as financial advisors in connection with the Transaction. Courts in this District have typically been "generous" in granting Rule 30(b)(6) depositions in Section 1782, even in cases with "tight schedule[s]" and other potential difficulties. *See, e.g.*, *In re Porsche*, 2016 WL702327, at *13 (it was "relatively evident from precedent in this circuit generous to Section 1782 applicants that there was a reasonable chance [respondents] would have to produce documents and prepare witnesses on a short timetable").

*Finally*, Petitioners are willing to meet and confer with Respondents to address any remaining concerns about undue burden. If the Court finds merit to any scope objections from any Respondent, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101.

**CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court grant its application pursuant to 28 U.S.C. § 1782 and enter an order authorizing Petitioners to issue subpoenas to HPS LLC, Authentic Brands LLC, Moelis, and Lazard for the production of documents and/or testimony for use in the English Proceeding.

Dated: August 24, 2026
New York, New York

Respectfully submitted,

PALLAS PARTNERS (US) LLP

By: /s/ Joshua A. Naftalis

Joshua A. Naftalis
Anastasia Cembrovska
John McAdams
Adair Kleinpeter-Ross
75 Rockefeller Plaza
New York, New York 10019
(212) 970-2300
joshua.naftalis@pallasllp.com
anastasia.cembrovska@pallasllp.com
john.mcadams@pallasllp.com
adair.kleinpeter-ross@pallasllp.com

*Attorneys for Petitioners*