UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

Arini Credit Master Fund Limited and
Tresidor Europe Credit Limited,

Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding

No. 26 Misc. 428 (JHR) (SLC)

**SUPPLEMENTAL DECLARATION OF FIONA HUNTRISS IN FURTHER SUPPORT OF THE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING**

I, Fiona Huntriss, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**A. Introduction and scope of this reply**

1. I am a solicitor of the Senior Courts of England and Wales, admitted to practice in 2010, and a partner at Pallas Partners LLP ("Pallas"), with offices at 110 Bishopsgate, London EC2N 4AY. I made the first declaration in support of this Application dated 24 August 2026 (the "First Declaration"). I adopt the defined terms used in the First Declaration unless otherwise stated or the context requires.

2. I make this supplemental declaration in further support of Petitioners' "Application" and in response to the opposition papers served by Respondents on 21 September 2026, and in particular the Declaration of Tom Smith KC dated 21 September 2026 (the "Smith Declaration"), insofar as those papers raise matters of English law and English procedure.

3. Except as otherwise indicated, the statements in this declaration are based on my own knowledge, on my review of the documents to which I refer, or on information provided to me by my colleagues in our New York office, Pallas Partners (US) LLP, or by Petitioners. Insofar as the facts and matters stated are within my own knowledge,

they are true; insofar as they are not within my own knowledge, they are true to the best of my knowledge and belief.

4. In summary, and for the reasons set out below:

a. the opposition papers, and the Smith Declaration in particular, mischaracterise the contemplated English proceedings and disregard Petitioners' most recent pre-action letter dated 16 September 2026 (the "16 September Letter"), a true and correct copy of which is attached hereto as Exhibit 1, which sets out precisely the basis of Petitioners' concerns as regards the contemplated Section 423 Claim;

b. such proceedings are presently in reasonable contemplation in relation both to steps in the Transaction that have already been taken; and the anticipated further steps (on the basis that declaratory relief is presently available and, in any event, concrete steps already taken provide an objective basis for concluding that those future steps will occur); and

c. the English disclosure regime does not make Section 1782 relief unnecessary, does not provide Petitioners with any route to obtain the documents sought from the U.S. Respondents, and does not operate as a "proof-gathering restriction" that Petitioners are seeking to circumvent.

## B. The Transaction

5. Mr Smith's analysis rests on the premise that the contemplated Section 423 Claim is directed "solely" at a single future step[1] – i.e., the sale of a 50.1% interest in

[1] See paragraph 32 of the Smith Declaration.

certain Group intellectual property to a joint venture entity controlled by ABG (which he calls the "Potential 50.1% Transfer" and which my First Declaration called the "50.1% Disposal") – and that, because that step has not yet occurred, the claim is premature and would be struck out. That premise is fundamentally wrong: Petitioners' Section 423 Claim would, in my view, survive a strike-out application.

6. As my First Declaration explained, Petitioners' contemplated Section 423 Claim challenges the Transaction as a whole, including but not limited to the 50.1% Disposal. That has been Petitioners' consistent position in pre-action correspondence.

7. Petitioners' 2 August Letter Before Claim (Exhibit 6 to the First Declaration) stated: "*The statutory elements for s.423 IA 1986 appear to be satisfied in the present case and so the Transaction as a whole, as well as the individual steps in the Transaction including the raising incremental financing from HPS and Authentic Brands, the release of Noteholders' security and the transfer, and contemplated further transfer of the Group's most significant assets at what appears to be a substantial undervalue, are liable to be set aside*."

8. It is also stated expressly in the 16 September Letter (Exhibit 1 hereto), which the Smith Declaration fails to address. I refer to that letter in full. In particular:

a. Paragraph 4 of the 16 September Letter states that Petitioners' anticipated claims under Section 423 are "*not […] founded solely on a concern that 'ABG will acquire 50.1% of the Brand IP from Silverco in exchange for the DDTL*'".

b. Paragraph 5 states that Petitioners "*remain concerned that steps already taken in respect of the Transaction constitute a transaction defrauding creditors within the meaning of s.423*", including the transfer of Group intellectual property to SilverCo, the licence-back

of that intellectual property to AMLL on terms not disclosed to Petitioners, the entry into the DDTL on terms which Petitioners understand expressly contemplate the 50.1% Disposal, and the release of the Noteholders' security and grant of new security in favour of the New Money Lenders.

c. Paragraph 6 makes clear that, while the letter then focuses in detail on the steps not yet taken (given the framing of Latham & Watkins' letter of 2 September 2026), Petitioners did so without prejudice to their position on the steps already taken.

9. It is telling that neither the opposition papers nor the Smith Declaration engages with the 16 September Letter, which was sent to the Group's legal advisers five days before the opposition papers were served and which set out Petitioners' position squarely. The suggestion that Petitioners have conceded that there is no arguable claim in respect of the steps already taken is therefore incorrect: I made no such concession in my First Declaration, and Petitioners have not made one.

10. Mr Smith also asserts (Smith Declaration, paragraph 7) that the defined term "Transaction" is used ambiguously. That is not correct; in any event, any lack of clarity as to the precise steps of the Transaction arises only as a result of the lack of information that has been provided to the Petitioners to date. As used by Petitioners, the "Transaction" refers to the New Money Transaction *and* the 50.1% Disposal together, as connected components of a single integrated financing and reorganisation of the Group's most valuable assets. The steps already taken and the anticipated further steps are, on Petitioners' case, part of one overall Transaction with the Prejudicial Features (as defined and described in the 16 September Letter).

**C. The contemplated proceedings**

11. Mr Smith frames the issue as whether the Section 423 Claim is presently "ripe" or constitutes an "accrued right of action" (Smith Declaration, paragraphs 6, 11, 37–40). I understand that that is not the relevant question; rather, the relevant question is whether English proceedings are within reasonable contemplation. The answer to this is clearly "yes": Petitioners have developed a legal theory under s.423, have taken the pre-action steps required by the Practice Direction on Pre-Action Conduct and Protocols, have engaged and continue to engage in extensive pre-action correspondence, are liaising with the potential Defendants to that claim with respect to voluntary pre-action disclosure (see, most recently, the 16 September Letter), and have instructed English solicitors and counsel with respect to the preparation of those proceedings.

12. In particular, these contemplated proceedings relate both to: (i) steps already taken; and (ii) anticipated further steps, all forming part of the Transaction. I address both aspects of the contemplated proceedings below.

*Steps already taken*

13. First, and contrary to Mr Smith's suggestion (Smith Declaration, paragraph 8), contemplated proceedings arise with respect to steps already taken as part of the Transaction - including the transfer of the Brand IP from AMLL to SilverCo, and the licence-back of that intellectual property to AMLL. This is clear from Petitioners' position, and the 16 September Letter, which state that Petitioners are concerned about the steps already taken which might be open to challenge under s.423. Whilst Petitioners seek further information on those steps (such as the terms of the licence-back, and valuation or market-testing material bearing on the adequacy of the consideration) they have not conceded, and do not concede, that

such claim does not arise, and have at all times reserved their rights including as to such a claim. To the contrary, the concerns they have are the reason for the discovery sought.

14. A central plank of Mr Smith's analysis is the proposition that the 'hallmark' of a transaction at an undervalue is a reduction in the company's net asset value, such that the grant of security, or a transfer to a wholly owned subsidiary, cannot be a transaction at an undervalue (Smith Declaration, paragraphs 19 and 30, relying on *Re M C Bacon Ltd* [1990] BCLC 324 and *Burnden Holdings (UK) Ltd (In Liquidation) v Fielding* [2019] EWHC 1566 (Ch)). That is not a complete or settled statement of English law. The statutory test under s.423(1)(c) turns on a comparison of the value of the consideration given and the consideration received; it does not, on its face, depend on a diminution in net assets or on the grant of proprietary rights.

15. More recent authority is to the contrary of the proposition for which Mr Smith contends. In *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542, a true and correct copy of which is attached hereto as Exhibit 2, Arden LJ stated at [138] that s.423(1)(c) "*did not refer to a diminution in assets and does not depend on the grant of proprietary rights*", and that there was no reason why the value of the right to have recourse to the security and to take priority over other creditors should be left out of account. In *Hotel Portfolio II UK Ltd v Marlborough Developments Ltd* [2024] EWHC 3075 (Comm), a true copy of which is attached hereto as Exhibit 3, Bryan J likewise stated at [37] that "*a transaction granting security does deplete the debtor's assets, and can be one for no consideration*". The reliance in *Re M C Bacon* on the absence of any effect on net assets is, at the least, in tension with these decisions and may no longer represent the law. This is a contested question that could not be determined on a strike-out (meaning any application for strike-out would be refused), and it is certainly not one for this Court.

16. Mr Smith's analysis also assumes that the transfer of the Brand IP was, in substance, value-neutral (Smith Declaration, paragraph 30(1)). That cannot be assessed on the present material, and Petitioners are in no position to accept it. AMLL parted with ownership of the Brand IP and retains only a licence-back, on terms the Group has refused to disclose. A licence is not equivalent to ownership: if, as Petitioners anticipate, it is revocable or terminable on foreseeable events such as a restructuring of the Group's debt or a change of control, or triggers prohibitive liquidated damages, it may be worth substantially less than the asset given up. If that reduction in value is not reflected in the consideration, the transaction is at an undervalue.

17. The point is not met by Mr Smith's contention (Smith Declaration, paragraph 30) that any value passing to SilverCo is matched by an equivalent increase in the value of SilverCo's shares, which AMLL indirectly owns. That confuses the consequence of a transaction with the consideration for it. As the Court of Appeal held in *Jones v National Westminster Bank Plc* [2001] EWCA Civ 1541, a true and correct copy of which is attached hereto as Exhibit 4, the fact that a transaction causes the transferor's shares to increase in value "*is irrelevant to the question as to what was the relevant transaction and what was the relevant consideration*".[2] SilverCo's ownership of the Brand IP, and any consequential increase in the value of AMLL's indirect shareholding, is not consideration provided by SilverCo for the transfer. Further, Mr Smith notes that SilverCo is not wholly owned by AMLL, as SilverCo has issued a single Class B Share to Silver HoldCo B, an entity outside the Restricted Group. He characterises this as de minimis (Smith Declaration, para 30(1)). Petitioners are unable to accept this proposition, not least in circumstances where Mr Smith has not explained the rights which attach to the special class of shares, a point on which Petitioners have sought clarity

[2] At [27].

from Latham, as set out in paragraph 21 of my First Declaration. Latham has failed to provide any information or documents setting out the rights attaching to the Class B Shares.

18. It also appears to have been a purpose of AMLL in transferring Brand IP to SilverCo to put assets beyond the reach of the Noteholders or otherwise prejudice the Noteholders' interests as required by s.423(3). As a matter of English law, the prohibited purpose need not be the sole or dominant purpose of the transaction: it is sufficient that the statutory purpose "*can properly be described as a purpose and not merely as a consequence, rather than something which was indeed positively intended*", and one such purpose may co-exist with another of equal potency (*Inland Revenue Commissioners v Hashmi* [2002] EWCA Civ 981 at [23] per Arden LJ a true and correct copy of which is attached hereto at Exhibit 5). It follows that a prohibited purpose may co-exist with an overall legitimate commercial purpose, such as raising new money. The requisite subjective purpose may be established by inference: the court is required to "*assess all of the evidence, find the primary facts, and determine, by a process of inference, whether [the debtor had] the necessary subjective state of mind*", and the facts from which inferences may be drawn may include the transaction's "*obvious or self-evident consequences*" (*Credit Suisse Virtuoso SICAV-SIF v SoftBank Group Corp* [2025] EWHC 2631 (Ch) at [618] per Miles LJ a true and correct copy of which is attached hereto at Exhibit 6). It is not, however, sufficient merely to show that the transaction had the prejudicial consequence in question; something more is required. Here, the self-evident consequences of the steps taken include the removal of the Brand IP from the Noteholders' security package and its subjection to security in favour of the New Money Lenders, subordinating Petitioners' interests. Respondents will say this depends on inference; but the inferences are plainly reasonable, the Group has had every opportunity to correct Petitioners' understanding and has declined to do so, and the documents sought go directly to that question. That is a reason for discovery, not against it.

*Anticipated further steps*

19. As above, Petitioners also have contemplated proceedings with respect to further steps to be taken, i.e. the 50.1% Disposal. Whilst Respondents state that this has not yet been completed: (a) concrete steps have been taken towards the 50.1% Disposal; (b) Petitioners understand that the 50.1% Disposal may be implemented in short order; and (c) the fact that it has not yet completed does not act as a bar to Petitioners' contemplated proceedings.

20. As to the status of the 50.1% Disposal, which is part of the larger Transaction:

a. On 20 July 2026, the AMLL board approved the £100 million DDTL conditional on the transfer of a 50.1% interest in the relevant Brand IP to ABG (a true and correct copy of which is attached hereto at Exhibit 7);

b. On 22 July 2026 Silver HoldCo B granted a floating charge in favour of the Security Agent for the New Money Lenders (a true and correct copy of which is attached hereto as Exhibit 8), which expressly contemplates that Silver HoldCo B will hold intellectual property and/or shares in the companies forming the Cayman holding structure, including SilverCo;

c. A single Class B Share, the rights attaching to which are not known to Petitioners, was issued by each of SilverCo and Silver HoldCo 1 (the parent undertaking of SilverCo) to Silver HoldCo B no later than 14 August 2026 (when Latham & Watkins referred to the fact that Silver HoldCo B holds the shares, in the present tense, in their letter dated 14 August 2026 – Exhibit 12 to the First Declaration), and likely much earlier;

d. On 22 July 2026 Silver HoldCo B granted an equitable mortgage over the Class B Shares (at that stage, to be issued) in SilverCo and Silver

HoldCo 2, in favour of the Security Agent for the New Money Lenders (true and correct copies of which are attached hereto as Exhibits 9 and 10);

e. On 17 August 2026, Latham and Watkins in their letter (Exhibit 14 to the First Declaration) stated that their clients undertook to give 14 days' notice to, among others, the Petitioners before undertaking the 50.1% Disposal (albeit only on these narrow terms and only for 90 days from the date of the undertaking); and

f. Mr Smith goes no further than saying "*I am instructed that there are no active negotiations, agreed terms, or concrete plans to complete the [50.1% Disposal]*" (Smith Declaration, paragraph 36), which does not go as far as saying there are no draft terms or documents stopping short of "agreed terms" or indicative plans with respect to this aspect of the Transaction. He may have based himself, at least in part, on Kirkland & Ellis LLP's Memorandum of Law in Opposition dated 21 September 2026. It states, on page 5, that: "*No **active negotiations** toward [the Potential 50.1% Transfer] **are underway**, and no **concrete** plans for the Potential 50.1% Transfer exist*" (emphasis added). The emphasized words, which have plainly been chosen with care and deliberately, beg questions as to whether negotiations have already occurred and whether there are plans, albeit not *concrete* plans, for the transfer.

21. There is, therefore, an objective basis on which to conclude that the 50.1% Disposal will occur.

*The availability of declaratory relief*

22. As reflected in the 16 September Letter, Petitioners' position is that they are able to initiate proceedings in relation to the 50.1% Disposal even if it has not yet occurred, for the reasons set out in further detail below.

23. I therefore disagree with Mr Smith's suggestion (Smith Declaration, paragraphs 37 to 41) that, because the 50.1% Disposal has not occurred, no claim (other than (possibly) injunctive relief) is available to Petitioners.

24. I have set out above why Petitioners have a contemplated claim with respect to steps already taken. As regards contemplated further steps, Petitioners would have proper grounds to seek declarations under the English court's discretionary power to grant declaratory relief. By way of example, declarations might be sought as to (a) the parties' rights in relation to the Brand IP, and whether the 50.1% Disposal, if implemented, would constitute a transaction liable to be set aside under s.423; and (b) the effect of the arrangements involving Silver HoldCo B Limited, including the floating charge which expressly contemplates that Silver HoldCo B Limited will hold intellectual property, and the Class B Shares which may operate to transfer ownership or control of the Cayman holding structure (or part of it) outside of the Restricted Group. These are matters on which Petitioners have expressed concern in pre-action correspondence and on which the Group has declined to provide adequate explanations.

25. The power to grant declaratory relief is discretionary. In *Rolls-Royce Plc v Unite the Union* [2010] 1 W.L.R. 318 at [120], a true copy of which is attached hereto as Exhibit 11, Aikens LJ summarised the applicable principles as including that: (1) there must, in general, be a real and present dispute between the parties as to the existence or extent of a legal right, although the claimant does not need to have a present cause of action against the defendant; (2) each party must, in general, be affected by the court's determination of the issues concerning the legal right in question; (3) the court must ensure that all sides of the argument

will be fully and properly put; and (4) the court must ask whether declaratory relief is the most effective way of resolving the issues raised.

26. In my opinion, Petitioners would satisfy these requirements: there is a genuine and active dispute as to the propriety of the Transaction and the anticipated steps; Petitioners, as creditors whose security has been affected, are plainly affected by its determination; the Group and ABG are proper contradictors with a true interest in opposing a declaration; and a declaration as to the parties' rights would serve the useful purpose of clarifying whether the anticipated steps, if implemented, would constitute a transaction liable to be set aside under s.423 - a question that cannot effectively be resolved by other means in circumstances where the 50.1% Disposal has not yet been completed.

27. Mr Smith does not deal with the availability of declaratory relief, even though in the 2 August Letter Before Claim, Petitioners expressly reserved their rights to seek declaratory relief.

**D. The role of the Respondents in the Transaction and the location of relevant documents, as indicated by public filings**

28. I have reviewed financial statements and other publicly available documents relating to, among others, Authentic Brands LLC, ABG Europe (UK) Limited ("ABG UK"), HPS LLC, HPS Investment Partners (UK) LLP ("HPS UK"), Lazard, Lazard & Co., Limited ("Lazard UK"), Moelis, and Moelis & Company UK LLP ("Moelis UK").

29. Respondents contend that the relevant documents are all held by these UK affiliates and that the U.S. Respondents hold nothing unique. In my view, the information referenced above does not support that contention. They indicate that the UK affiliates are service and support entities that act for, are funded by, and exist for the ultimate benefit of their respective U.S. parents. In the case of ABG UK, the entity does not appear itself to own, licence or exploit any intellectual property, which is significant given that the ABG side of the Transaction concerns the Brand IP. In the case of HPS UK, Lazard UK and Moelis UK, the

entities are advisory and asset management service providers to their US parents; they do not themselves lend or hold the economic interest in the Transaction, and the relevant documents bearing on the advisory work and transaction mechanics are likely to sit, in whole or in part, at US group level. I address the U.S.-law question of possession, custody or control only insofar as it is informed by these filings; the legal test is addressed in Petitioners' reply memorandum.

30. ABG UK is a wholly owned subsidiary of Authentic Brands Group LLC (i.e. ABG US), incorporated in Delaware. Unless otherwise stated, information in this paragraph is from ABG UK's most recent financial statements (a true and correct copy of which is attached hereto as Exhibit 12). Its principal activity is described as "*services supporting that of licensing and commercialisation of intellectual property and similar products to group and related undertakings*", with revenue earned through a recharge model under which operating costs are recharged to other group entities. ABG UK is funded by intra-group balances and receives working capital through the bank accounts of other group companies (note 21). Its two directors, Jay Lionel Dubiner (Authentic Brands LLC's Chief Legal Officer) and Kevin Gwaltney Wills (Authentic Brands LLC's CFO), received no remuneration from the UK entity (note 7), nor did any key management personnel (note 21); its workforce comprised only those two directors and 52 administrative staff (note 6). Critically, the balance sheet discloses no intangible assets, no loans receivable, and no investments. ABG UK does not therefore appear itself to own, licence or exploit any intellectual property, or to lend to third parties, which is consistent with the economic substance of the ABG side of the Transaction sitting at U.S. group level rather than with ABG UK. Based on publicly available information (with the exception of Mr Wills, true and correct copies of each individuals' LinkedIn profiles are attached hereto as Exhibits 13 to 20; a true and correct copy of the Authentic Brands announcement of Mr Wills' appointment as CFO is attached as Exhibit 21), Authentic Brands' executive leadership (which includes Mr Dubiner and Mr Wills) are based in New York or, in the case of two

individuals, in Florida. Authentic Brands is headquartered at 1411 Broadway, New York, NY 10018. Accordingly, Petitioners understand that the Transaction would have been approved by Authentic Brands LLC employees based in New York, who would therefore have been involved in the Transaction, at least insofar as it pertains to Authentic Brands.

31. HPS UK is a limited liability partnership whose members, according to its MIFIDPRU8 disclosure (a true and correct copy of which is attached hereto as Exhibit 22), are each wholly owned by HPS Investment Partners, LLC (i.e. HPS LLC); it is therefore an indirect wholly owned subsidiary of HPS LLC. Its financial statements describe its activity as providing "*asset management, investment research and capital raising services to HPS Investment Partners, LLC*", and its MIFIDPRU8 disclosure confirms that it "*provides sub-advisory services to HPS LLC in respect of the HPS Funds*". Unless otherwise stated, the information in this paragraph is from HPS UK's most recent financial statements (a true and correct copy of which is attached hereto as Exhibit 23). As I understand the structure, it is those HPS Funds - not HPS UK itself - that are the relevant lenders under the Transaction. HPS UK operates on a cost-plus basis: it receives a service fee equal to 110% of its eligible expenses from HPS LLC under a Management Support Service Agreement, and its accounts state that "*[a]ll service fee was received from the United States*" (note 12); for the year ended 31 December 2025, that fee was £108,369,872. As with ABG UK, HPS UK's balance sheet discloses no intangible assets, no loans receivable, and no investments, and the accounts confirm that it "*does not maintain interest-bearing financial instruments*" (note 10). HPS LLC's Form ADV filed with the SEC (Exhibit E to the Naftalis Declaration) also states that HPS LLC maintains an office at 9 Bressenden Place, London, the same location as HPS UK, and that HPS LLC maintains "books and records" with HPS UK at the same London office. Another SEC filing (a true and correct copy of which is attached hereto as Exhibit 24) states that HPS LLC "*controls the other Existing Advisers,*" which includes HPS UK. HPS UK does

not appear itself to hold the economic interest in the Transaction. While I am not aware of the names of the entities which are HPS Funds, based on public filings, the minutes of the meeting of directors on 30 July 2026 (Exhibit 7 hereto) state that the funds are "managed" by HPS LLC. Petitioners therefore understand that the Transaction would have been approved by the HPS LLC Investment Committee. Based on an SEC filing for HPS Corporate Lending Fund (a true and correct copy of which is attached hereto as Exhibit 25), the HPS Investment Committee as at 20 March 2026 was comprised of Michael Patterson, Scott Kapnick, Scot French, Purnima Puri, Faith Rosenfeld, Colbert Cannon, Michael Fenstermacher, Jeffrey Fitts, Vikas Keswani, and Grishma Parekh. Based on publicly available information (with the exception of Scot French, true and correct copies of the individuals' LinkedIn profiles are attached hereto as Exhibits 26 to 34; a true and correct copy of a Forbes profile of Mr French is attached hereto as Exhibit 35), these individuals are predominantly based in New York, or otherwise based in the U.S. HPS LLC is also headquartered in New York. Accordingly, Petitioners understand that the same Investment Committee, based in New York, would have approved the Transaction, and were involved in the Transaction, at least insofar as it pertains to the HPS Funds.

32. According to information filed with the United States Securities and Exchange Commission ("SEC") (a true and correct copy of which is attached hereto as Exhibit 36), Lazard indirectly owns and operates its advisory business through its US affiliate Lazard Frères & Co. LLC ("Lazard US") and Lazard UK. According to a report issued by FINRA (a true and correct copy of which is attached hereto as Exhibit 37), Lazard US and Lazard UK are under "common control."

33. Lazard UK is a company incorporated in England and Wales (registered number 00162175). Its most recent financial statements (a true and correct copy of which is attached hereto as Exhibit 38) describe its primary activity as the provision of financial and strategic advisory services. However, the accounts state that the company "*has no employees*";

all personnel are employed by a separate service subsidiary, Lazard & Co., Services Limited ("LSL"). Lazard UK is part of the wider group headed by Lazard, which is incorporated in the United States and stated to be its its "*ultimate parent company*" and "*ultimate controlling party*". The most recent financial statements of LSL (a true and correct copy of which is attached hereto as Exhibit 39) similarly state that Lazard is its "*ultimate parent company*", LSL fully recharges its costs under an employee service agreement, which are "*managed on a consolidated basis for Lazard, INC. group as a whole*", and that Lazard issues LSL employees restricted stock units.

34. Respondents' Soloway Declaration states that no Lazard Inc. employees were involved in the Transaction, but simultaneously describes Lazard Inc. as a holding company with no direct operations. The declaration does not state that no U.S.-based Lazard employees were involved - a narrower point that is material, given that the Lazard group operates offices in the United States from which advisory services are provided. If Lazard UK itself has no employees, it is difficult to see how seeking disclosure from Lazard UK alone could yield documents bearing on the advisory work carried out in connection with the Transaction.

35. According to information filed with the SEC (a true and correct copy of which is attached hereto as Exhibit 40), Moelis indirectly owns and operates its advisory business through its US affiliate, Moelis & Company LLC ("Moelis NY"), and Moelis UK. According to a report issued by FINRA (a true and correct copy of which is attached hereto as Exhibit 41), Moelis NY and Moelis UK are under "common control".

36. Moelis UK is a limited liability partnership incorporated in England and Wales (registered number OC340005), and the UK arm of the advisory group headed by Moelis, which is incorporated in the United States and listed on the New York Stock Exchange. The LLP's most recent financial statements (a true and correct copy of which is attached hereto

as Exhibit 42) confirm that its controlling party is a US affiliate of Moelis, Moelis & Company International Holdings LLC, and Moelis UK's ultimate parent is Moelis, with a registered address at 399 Park Avenue, New York (note 18). Share-based compensation for Moelis UK employees is provided under a plan operated by its US-listed ultimate parent, Moelis (note 8). The same pattern is evident: the UK entity is a subsidiary of a U.S. parent, operating as an advisory arm of the U.S.-headed group.

37. In my experience, financial advisers working on liability management exercises or similar new money transactions involve US expertise within their overall team. Lazard and Moelis also each operate their advisory businesses using integrated teams that include their U.S. and U.K. affiliates. For example, Lazard's engagement letters (an example of which was obtained from a US court file and a true and correct copy of which is attached hereto as Exhibit 43) generally provide that Lazard US and Lazard UK work together: "*In connection with the services to be provided hereunder, Lazard [US] may employ the services of its affiliates and may share with any such entity any information concerning the Company*". Similarly, Moelis emphasizes in its investor relations materials (a true and correct copy of which is attached hereto at Exhibit 44) that it is "One Firm" that operates a "*globally integrated platform*" with "*global execution capabilities*". Petitioners therefore believe that US employees of Lazard and Moelis, or their US affiliates, are likely to have been involved in the Transaction.

38. In short, the picture that emerges from the public information is of service entities that carry out functions for and/or work alongside their U.S. parents - not entities that independently advise, transact, lend, hold intellectual property, or bear the economic interest in the Transaction. Respondents' suggestion that the U.S. Respondents played only a "peripheral" role is difficult to reconcile with these filings. On the contrary, the entities that entered into, and stand to benefit from, the Transaction (including the HPS Funds and ABG US) sit at U.S. level. The UK affiliates' own accounts also show that they operate as

support vehicles for those U.S. entities. This is consistent with the involvement of U.S. personnel in the relevant work.

**E. The English disclosure regime**

39. Respondents contend that CPR 31.16 and 31.17 provide, or may in future provide, a route by which Petitioners could obtain the documents sought, and that the Application is therefore an attempt to circumvent English "proof-gathering restrictions".[3] I disagree, for the following reasons.

40. CPR 31.16 provides no route against the U.S. Respondents. Pre-action disclosure under CPR 31.16 is available only against a person who "*is likely to be a party to subsequent proceedings*": CPR 31.16(3)(a); and see *Black v Sumitomo Corporation* [2001] EWCA Civ 1819, a true and correct copy of which is attached hereto as Exhibit 45, the leading Court of Appeal authority on the rule.

41. In *Black v Sumitomo Corporation*, the Court of Appeal set aside an order for pre-action disclosure, holding that CPR 31.16 involves two stages: first, the jurisdictional thresholds in the rule must be crossed; and second, the court must separately exercise its discretion, having regard to all the circumstances, including the nature of the loss, the clarity and identification of the issues, the nature and width of the documents sought, and the opportunity the applicant has to make his case without pre-action disclosure ([81], [88], per Rix LJ). Importantly, CPR 31.16(3)(a) requires the respondent to be "*likely to be a party to subsequent proceedings*", and the Court of Appeal held that this means a person who "*may well*" be a party if proceedings are issued ([71]–[72]). HPS LLC is not, so far as Petitioners are aware, a party to the Transaction, so it would not be a party to the Section 423 Claim. It follows that CPR 31.16 provides no route to obtain pre-action disclosure from the US Respondents – i.e., the very entities from whom disclosure is sought under this Application.

[3] See page 19 of Kirkland's Memorandum of Law and paragraph 43 of the Smith Declaration.

42. The suggestion that pre-action disclosure might be available against a prospective English defendant such as ABG UK does not meet the point, because it would not yield the documents held by the U.S. Respondents.

43. CPR 31.17 is not an answer either. Non-party disclosure under CPR 31.17 is available only once proceedings have been commenced. By definition, it presupposes that a proceeding is already on foot. But a central purpose of Section 1782 is to enable Petitioners – as in the present case - to investigate and assess their potential claims before deciding whether and how to commence proceedings. The fact that a different disclosure mechanism might become available at a later stage, if and when proceedings are issued, does not mean that Section 1782 relief is unnecessary or beyond reach now.

44. In any event, CPR 31.17 would not provide a realistic route to the documents held by the U.S. Respondents. Two distinct questions must not be run together: (i) whether an English court could, in principle, order non-party disclosure against an entity subject to its jurisdiction; and (ii) whether such an order would actually give Petitioners access to the documents held by the U.S. Respondents. Even if the answer to (i) is yes as against an English entity such as HPS UK, it does not follow that CPR 31.17 provides a realistic alternative means of obtaining disclosure directly from the U.S. Respondents. An offer or undertaking by HPS UK not to resist a future CPR 31.17 application in respect of documents said to be within HPS UK's control does not address the fact that the documents sought are held by different entities (HPS LLC and Authentic Brands LLC), and does not demonstrate that Petitioners would obtain the same material - including the U.S. entities' own internal analyses, communications, and decision-making materials - through the English regime. Mr Smith's evidence (Smith Declaration, paragraph 43) is carefully framed to suggest that disclosure could be sought from UK entities, without ever asserting that the documents held by the U.S.

Respondents themselves could be reached; that is an implication he stops short of stating, and it would not be correct.

45. CPR 31.16 and 31.17 are not "*rules akin to privileges that prohibit the acquisition or use of certain materials*". Far from it, they are domestic procedural mechanisms governing when, and from whom, an English court will itself compel disclosure. They do not *prohibit* a party from acquiring or using evidence obtained through other lawful routes, including Section 1782. There is no rule of English law that prohibits Petitioners from obtaining or deploying evidence gathered through Section 1782, and there is no requirement under English law to exhaust CPR 31.16 or 31.17 before doing so.

46. For the same reasons, I do not accept Mr Smith's characterisation (Smith Declaration, paragraph 52) of CPR 31.16 and 31.17 as embodying a "*deliberate policy choice to restrict*" non-party discovery, or as reflecting a preference on the part of the English court to 'control' it. Pre-action disclosure and non-party disclosure were introduced into the general civil procedure of England and Wales as mechanisms that expanded, rather than curtailed, the circumstances in which disclosure may be obtained; the conditions in the rules govern when those mechanisms are available, but they express no policy against a party obtaining relevant evidence by other lawful means. Nor, in my experience, is there any principle that the English court prefers to 'control' the gathering of evidence for use in its proceedings; as explained above and in my First Declaration, the English court will readily admit relevant evidence lawfully obtained abroad, including through Section 1782. Mr Smith cites no authority for these propositions, and I am aware of none.

47. It follows that obtaining discovery under Section 1782 would not "circumvent" or "frustrate" the English disclosure regime, and the question is not whether Section 1782 discovery is broader or narrower than what an English court would itself order. Section 1782 is a distinct and lawful procedure of the United States courts; that it may yield

evidence an English court would not itself compel does not frustrate any English policy, as the authorities on the English courts' receptivity to Section 1782 evidence confirm. How and whether to deploy that procedure is a matter of U.S. law and for Petitioners' U.S. advisers; it offends no restriction of English law.

48. This is consistent with the evidence in my First Declaration regarding the English courts' willingness to admit evidence obtained through Section 1782. As set out there, the English courts have repeatedly declined to restrain parties from seeking Section 1782 discovery and have admitted the resulting evidence, notwithstanding that such discovery would not have been available from an English court: see *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provinciën" NV* [1987] AC 24; *Nokia Corporation v Interdigital Technology Corp* [2004] EWHC 2920 (Pat); and *BHP Group (UK) Ltd v PGMBM Law Ltd* [2025] EWHC 3153 (TCC). The English court is, as a matter of principle, receptive to the use of Section 1782 evidence.

49. Finally, I note that the English courts do not order pretrial depositions of non-parties, and there is no English analogue to deposition discovery which I understand is available in U.S. federal courts.

50. It follows that the Application does not seek to circumvent anything. Petitioners are seeking discovery to which they are entitled under U.S. law, from U.S. entities, for use in English proceedings that are within reasonable contemplation, in circumstances where the English disclosure regime provides no realistic route to the same material from the same entities.

**F. Conclusion**

51. For the reasons set out above, the opposition papers do not undermine the basis for the Application. The contemplated Section 423 proceedings are within reasonable contemplation; the English-law objections raised by Mr Smith are, at their highest, contested

questions unsuitable for resolution on this Application; and the English disclosure regime neither provides Petitioners with the discovery sought from the U.S. Respondents nor constitutes a proof-gathering restriction that Petitioners are attempting to circumvent. The UK public filings of the UK affiliates do not support Respondents' contention that the U.S. Respondents played only a "peripheral" role or hold no unique documents. I respectfully maintain the views expressed in my First Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 28 September 2026

London, England

____________________________

Fiona Huntriss

Partner, Pallas Partners LLP